THE PEOPLE, *ex rel.* Jeremiah Cooper, *vs.* NEWCOMB FIELD·

The legislature, in framing the statute relative to forcible entry and detainer, intended to require the party to disclose, in his complaint, the nature of his right to the possession, and how and from whom it was acquired, so that it would appear that his right was a legal and valid one.

An allegation, in the complaint, that the complainant and his grantor have been in the quiet and peaceable possession of the premises for many years, and for more than five years; that he had a good legal right and estate to said premises; and that he still has a legal right to the possession of said premises, is not in compliance with the statute; it being a mere allegation that the right exists, without stating the right. Such a complaint, however, is not so defective as to deprive the officer of jurisdiction.

Possession is *prima facia* evidence of ownership in fee; and if the allegation in the complaint is not sufficiently full and specific, the defendant should raise the question before the judge, to entitle himself to the benefit of the objection.

He may move, at a special term, to dismiss the proceedings for the defect.

The legislature intended to prevent all persons, however good their title or right to the possession of premises, from forcibly acquiring possession of them, and, having peaceably acquired possession, from holding out another, who, at the time of such entry or holding out, was peaceably in possession thereof.

Hence, it matters not how invalid the occupant's right to possession may be; if he is in the peaceable and quiet occupancy of premises, that occupancy cannot be *forcibly invaded.*

For all purposes of the statute regulating proceedings in forcible entry and detainer, the person in possession of a house must be deemed to be in possession of the land; for one person cannot be in possession of a house, and another be, at the same time, in possession of the land on which it stands.

Where a building was on the land of the state, without objection from any one, and an individual had the right to keep it there, until the state, or its grantee or lessee, should require its removal; and although he did not occupy or use it, yet he had been in the receipt of the rents and profits, and was about to put it in order, to rent it, went into it whenever he had occasion to do so, and no other person had either the possession, or the right to the possession; *Held,* that he was in the actual possession of the house.

Actual occupancy, at the time of the entry, is not necessary, in order to entitle the person injured to proceed under the statute.

The entry, to be forcible, ought to be accompanied by some circumstances of actual violence or terror. If these circumstances exist, they will constitute the entry forcible, though no person be on the premises at the time it is made.

Where the defendant not only entered upon the premises in question, but removed therefrom the building, having with him such a number of persons

The People *v.* Field.

as would render it unsafe for the occupant to attempt to go again upon the land, and he was told that the defendant had now got possession of the land, and meant to hold it; *Held,* that enough was proved to require the court to submit it to the jury whether there was not a forcible detainer.

CERTIORARI to the county judge of Madison county, to remove proceedings before him under the statute relative to forcible entry and detainer.

The proceedings were commenced before the county judge, by a complaint under the statute entitled "Of forcible entry and detainer," wherein the complainant, Cooper, alleged that the defendant Field, at the village of Oneida in said county on the 9th day of June, 1863, at about two o'clock in the morning, did unlawfully make a forcible entry into the lands and premises of the complainant, to wit: [describing them;] on which stood a shop, a building of the complainant; and that the said Newcomb Field did then and there, (with a large force of men under and in his employ;) violently, forcibly and unlawfully, and with strong hand, eject and expel the complainant from his said lands and premises, and forcibly and violently, and unlawfully took up said shop or building by main force, and removed said building off of said premises into Phelps street and took possession of said land, and holds the complainant out of the possession of said land and premises. And the complainant further showed, that he and his grantor had been in the quiet and peaceable possession of said premises and shop for many years, and for more than five years, and that he had a good and legal right and estate to said premises, and that he still has a legal right to the possession of said premises; and that the said Newcomb Field still unlawfully and forcibly withholds and detains the said lands and premises from said complainant, against the form of the statute in such case made and provided.

Notice of this proceeding was given to the defendant, by the county judge, and a jury was summoned, to inquire

of the alleged forcible entry and detainer. On the day named in the precept and notice for the hearing of said matter, the parties appeared before the judge. The counsel for Field thereupon made the following objections to the complaint, viz: "1st. The complaint does not set forth the title of the complainant to the premises in question, but merely states a conclusion of law. 2d. The complaint states a conclusion of law as to the title, instead of setting out the facts." These objections were overruled by the judge, and to such ruling the said Field by his counsel excepted.

After the hearing of the testimony, the jury returned an inquisition in writing, by which they found as follows: "The undersigned jury have found and hereby find and present that Jeremiah Cooper of Lenox, aforesaid, has for many years, (by himself and his grantors,) been in the quiet and peaceable possession and in the possession of that certain piece or parcel of land situate in the town of Lenox aforesaid, in the village of Oneida, and which is bounded on the north by Phelps street, on the east by the Oneida Feeder, on the south by state land, and on the west by the street, being about twenty-eight feet on Phelps street, by sixteen feet deep. That the said Jeremiah Cooper and his grantor was long since peaceably possessed of the same, and that the estate and possession of the said Jeremiah Cooper so subsisted and continued until Newcomb Field, of Durhamville, in said county, on the 9th day of June, 1863, at Lenox aforesaid, did forcibly and unlawfully and with strong hand, enter into the said land and premises and eject and expel him, the said Jeremiah Cooper therefrom; and the said Jeremiah Cooper so expelled from the said land and premises, from the said 9th day of June, 1863, until the taking of this inquisition, unlawfully and forcibly and with strong hand, did keep out and does yet keep out to the great disturbance of the people of the state of New York, and contrary to the form of the statute in such cases made, and that the estate and

The People *v.* Field

right to possession of the said Jeremiah Cooper as afore-said, still subsist therein."

On filing the return of the county judge to the writ of certiorari, which return embraced the inquisition of the jury, the defendant Field appeared, in his proper person, and traversed the inquisition, denying that he was guilty of the said supposed forcible entry and forcible holding out in manner and form as in the said inquisition alleged. And he alleged that he or his grantors, or those whose estate he has in the lands in said inquisition described, had been in the peaceable and quiet possession thereof for the space of three whole years and over, next before the said inquisition found, and that the said Newcomb Field's interest therein has not, and is not ended or determined. On the filing of the said return and the said traverse, upon the motion of the defendant, an order was made, at a general term of this court, held on the 14th day of July, 1863, directing the inquisition and traverse to be sent down for trial at the next circuit to be held in Madison county. The issue was accordingly tried at the circuit held in that county, in January, 1864. The following testimony was given:

*James Fish*, sworn for the complainant, testified: "I reside in the village of Oneida, Madison county, and have for twenty years; I have worked at harness making, and I owned a harness shop; in May, 1857, I moved my shop on to the lot described in the complaint and which is represented on the map; the red lines indicate where the shop stood; I occupied the shop and continued in possession of the shop till July 31, 1862; I sold the shop to Mr. Cooper; the contract was in writing; he took possession of it; I surrendered possession to Mr. Cooper; I remained in it till January 1, 1863; I did not leave then; Mr. Cooper consented to let me remain in it under him as his tenant, until April 10, 1863; I did so remain in it, and then left and moved into my new shop; I then surrendered the

key of this shop to Mr. Cooper; I had a set of hay scales which I used and occupied while I occupied the shop, until July, 1862; they were in front of my shop, in the open space between my shop and Main street; I used this open space as a platform for my scales; I occupied the south side of this shop, six or eight feet, with coal and lumber I had piled up there; before I moved the shop in 1857, it stood on the west side of Main street; I moved it by consent of Mr. Higinbotham; he said I might occupy it; nothing was said as to when I was to move it off; he said he couldn't tell when he should want it; I considered myself a tenant at will; I did not ask him how long it could remain; I did not tell him I would remove the shop when he desired, I expected to move it off when Higinbotham should want it; I paid no rent; afterwards I asked him how long it might remain; he could not tell; he said as long as two or three years; he said he did not want the lot until he sold the hemlock timber on it; I consider now, and always did, that I should move it whenever he should want it; I used it for a harness shop; Mr. Higinbotham gave me leave to put the hay scales there; Mr. Field came there the first time fore part of July, 1862, before I sold it, with some hands; his brother was with him; he took possession of a portion of the lot as follows, they had a plow and scraper; I forbid him from working there, and told him I would prosecute him if he did not leave; he worked a day and a half and then left; I served a written notice on him as he was undertaking to undermine my scales; I did not arrange with him to remove my hay scales, but I moved them because he dug around them so I could not use them; he stopped and left before I moved; he had dug on the south side and in the road as though he was to put up a building; I had lumber piled up in the rear of my shop, and he, Field, did not excavate there; I sold the shop to Cooper a week after; I moved the scales perhaps ten days previous; I claimed

The People *v.* Field.

the possession of the state land, and that the shop stood mostly on the state land; I swore upon the former examination that I sold nothing but the building to Cooper; I claimed the state land, and the right to occupy it as my own; Field did not come back and work any more while I was there; no more digging was done while I occupied the shop; I gave Cooper the key; I have no knowledge of other persons occupying it, except I delivered the key to Mr. Cooper; I can't say that Mr. Field excavated any more till after he removed the building; Field did not pile any building timber on the lot; the defendant did ask me to remove it; I offered to sell it to him; I told him if he would remove it, he might, at his own expense; I intended to remove it off; he said he would give $3 towards removing it; I had agreed with a man to move it; I got all ready to remove it; I had a conversation with Dygett, Edwards and Pendar about it; I did not say to them that I had made a sham sale of the shop to Cooper; I engaged men to move it; one man came to move or put a sill under it; I asked him what he would do it for; I afterwards made a bargain to move it; I told him I would not have a sill under; he put no sill under, and he claimed to move it, and I would not let him move it; the building stood on posts, blocks and stones; the three men came with rollers to move the building, and I wanted them to hold on; that I had sold the building to Cooper. The shop stood mostly on state land; I always claimed the state land, and the right to the possession of it; the building stood thirteen feet on state land as I claimed; the building was sixteen feet wide; there was a time when I had no knowledge that the building stood on state land, that is when I put it there; I first commenced to claim the state land about three years ago; I was there when the state surveyor surveyed out the feeder and marked on the building where the blue line, or state line came; from that time up to the time I sold to Mr. Cooper, I claimed

the right to occupy the state land; I made this writing
July 31, 1862." Writing read in evidence as follows, viz:

"This agreement, made this 31st day of July, 1862,
between James Fish, of the village of Oneida, Madison
county, N. Y. party of the first part, and Jeremiah Cooper,
of the town of Lenox, Madison county, N. Y. party of the
second part, witnesseth: that the party of the first part,
for and in consideration of the sum of one hundred dol-
lars, to be paid to him by the party of the second part, as
hereinafter provided, hath sold, and by these presents
doth sell unto the party of the second part his saddle and
harness shop, the one he now occupies in the village of
Oneida, situate near the bridge which crosses the feeder
on the road leading from Main street, opposite the Coe
block, to E. C. Sanders' wagon shop. The said party of
the second part hereby agrees to pay to the party of the
first part, for the said shop as aforesaid, the sum of one
hundred dollars, on or before the first day of January
next, with the right and privilege to pay the said sum at
any time he chooses before the first day of January next,
and whenever said money is paid, the said party of the
first part agrees to vacate and render up possession of said
shop to the party of the second part. Said shop is to
remain where it now stands, and the party of the first part
is to retain possession thereof, until said sum of one hun-
dred dollars is paid to him, which, when paid, he is to
render up possession thereof immediately to the party of
the second part. JAMES FISH,

JEREMIAH COOPER."

"Oneida, Dec. 29, 1862.

$70. On the 1st day of April next I promise to pay to
the order of Martin L. Cooper seventy dollars at the
Oneida Valley Bank, for value received.

(Indorsed.) JER'H COOPER,

MARTIN L. COOPER." JAMES FISH.

The People *v.* Field.

"Received, Oneida, Dec. 27, 1862, of Mr. Jeremiah Cooper, $100, in full of the within contract, $30 of which is for services rendered, and $70 is by bank note, indorsed by Martin L. Cooper, payable at Oneida Valley Bank, April 1, 1863.                    JAMES FISH."

"Cooper paid me $70 in money first day of January, and the balance was matter of account agreed to; after Field discontinued digging, he then served on me a written notice to move the shop in thirty days; I gave it to Mr. Snow, my attorney; I have looked for it and cannot find it."

*Jeremiah Cooper*, sworn, testified: "I am complainant; I am one of the parties to the above contract; I paid the $70 and the balance on account; I paid it to Mr. Fish; he was to occupy it under me as my tenant, until April 1, 1863, at which time he was to surrender possession to me of said premises; he gave me the key; I was in the shop when he left; I locked it up; I made an arrangement to rent the shop to Mr. Stocking; on Monday, June 8, 1863, I went to Oneida with my men and teams to turn the shop around so that its front would be on Phelps street; I unlocked, and went into the shop; I went to see Mr. Dygett; I met the defendant Field, near the water house of the New York Central Railroad, and he said to me, 'I understand you are going to move your harness shop around;' I told him I was, and I had my team and men there to do it, and was then going to see Mr. Dygett to superintend moving it around; he wished me not to do it then, he wished to buy my right there; I told him I would sell him my right; he said it would occupy some time; his trustees wanted him to pay the amount and he must see them, and he wanted me to wait till next day; I told him I would remain till four o'clock P. M. and send my team and men home if there was any prospect of negotiating a bargain; we then commenced talking of a negotiation; he said he

wanted to buy my right there and move off my shop so he could build; I proposed to join him and build a block with him; that I would build up to the blue line which was the state line, and he build the front; we talked of this proposition, of the new building, the size of it, 48 by 24 feet, and down to within six or eight feet of the water; I was to own up to the blue line, and he was to own west of the blue line; he said you made me that proposition heretofore, he then said 'I purchased the front at very high price with the understanding that I was to occupy the state land also; that he must consult the trustees before he could do it; he wanted me to make two propositions, one for my entire right, and one for me to remove the shop; I did so, and told him he might have my entire right for $500, or I would take my shop off and he pay me $425; he said he would consult the trustees, and would give me an answer in a few hours; he went to Ambrose Hill's flour store; he was one of the trustees, and they went to Bennett's, and Field went to Coe's; they were trustees of the land between the blue or state line and Main street; I sent my men home; I saw Field afterwards, that same day in the street; he said he had seen the trustees, and they had told him my price was too high, if I would take $300, I could have it; I asked him if it was for my entire right; he said yes; I then declined to take it; I asked him if it was the end of the negotiation; he said no, he would see the trustees again, and he then went to Bennett's shop; I went home two miles from Oneida; I returned to Oneida at six o'clock P. M.; I did not see defendant again that day; on Tuesday morning I went to Oneida to move my shop around; when I came there I found the shop in the centre of Phelps street; the defendant with six or eight men were digging right where my shop had stood; Phelps street runs east and west and Main street north and south; I said to Mr. Field, 'What does this mean?' he said,

'Mr. Cooper, I would liked to have settled this matter without any fuss; I could not do it; the trustees would not pay your price; they yesterday gave me a bond of indemnity to move your shop, and I have done so; I was bound to have possession of the land where this shop stood, or my money back;' I then spoke to the men who were digging, and told them to stop digging, that I wanted to move my shop back where it stood; Mr. Field came up to them and said, 'you keep on digging, I will back you up; Mr. Cooper, your shop stands there in the street, do you see it? I have now got possession of this lot, and I mean to hold it;' I then directed my men to go home and go to work, and I then went to Snow & Shocroft's office; Field moved the building off sideways; I intended to have moved it round, and six feet further east on to the blue line and state land, and have the front open on Phelps street; it was about nine o'clock A. M. when I got there; the day before I was in the shop, and when I went out I locked it up and put the key in my pocket; I knew two of the men Field had with him; from Main street to the east end of my shop was forty-six feet; they had been digging on the south side of the building to within about three feet of the building; they dug east as far as the shop extended; I swore before Judge Holmes that no violence was offered to me, and no threats made to me; * * * the shop was twenty-eight feet long, and about twenty feet to Main street; I knew Field was preparing to build a brick block there; I think I saw the defendant digging by the hay scales before I bought, between the shop and scales; Fish told me he had agreed to move the shop; I do not know whether it was before or after I bought it; I have no other buildings in Oneida; I went to Snow's office to examine with him and see if we could find the notice Mr. Fish spoke of; we could not find it; we found the notice Fish served on Field."

*James Fish,* recalled, testified: "The notice Mr. Field

served on me was for me to leave the premises and give up possession in thirty days; he served it on me in July, 1862; it was signed by Newcomb Field."

*Erasmus Stone,* testified : "I saw the defendant and his men preparing to remove this shop last summer, it was quite early, about four o'clock A. M.; I saw three or four men with Field; they were raising the building on timbers; they had some timbers under it, and screws under one end ; Mr. Fish occupied this shop four or five years, and until he moved into his new one."

*Chauncey Stocking,* testified : "I saw defendant and his men moving this building between four and five o'clock A. M. ; I knew Field; I live in Oneida; there were four or five hands; they got one roller under one corner; I saw them work but a few moments ; Cooper showed me the building after he went into possession, with a view of renting it to me; I had agreed to rent it ; he was to move it round; think there were no more men there than were necessary to move it."

The plaintiff having rested, the defendant, by his counsel, moved that the plaintiff be nonsuited, on these grounds :

"1st. The shop is personal property, and the possession of the shop is no possession of the land.

2d. It does not fall within the definition of forcible entry and detainer.

And as to estoppel, the defendant had a right to buy his peace.    The action cannot be sustained."

And after hearing counsel, his honor, the presiding justice, decided to grant the motion ; but on suggestion of the defendant's counsel, the court directed the jury to render a verdict for the defendant; and the jury accordingly found a verdict for the defendant, according to the direction of the court.

To which rulings and decisions the plaintiff's counsel excepted, and he also excepted to the decision of said justice in deciding to nonsuit the plaintiff.

Judgment was thereupon entered, quashing the inquisition, with costs, and the relator appealed.

*B. F. Chapman and C. B. Sedwick,* for the appellant.

*I. Messenger and D. Pratt,* for the respondent.

*By the Court,* MULLIN, J.   Before proceeding to examine the principal question presented on this appeal, it is necessary to dispose of a preliminary one suggested by the respondent's counsel, viz. whether the complaint is sufficient to give the officer before whom the proceedings were instituted jurisdiction.   The objection made to the complaint is, that it did not allege that the relator had an estate in freehold for a term of years then subsisting, or some other right to the possession thereof.

The complaint alleges that the relator and his grantor have been in the quiet and peaceable possession of said premises and shop for many years, and for more than five years, and that he has a good legal right and estate to said premises, and that he still has a legal right to the possession of said premises.   Neither a freehold interest, nor an interest for a term of years is alleged, nor is it shown what right the relator has to the possession, except such as the law may presume from the allegation that he and his grantor have been in possession for more than five years, and has a good and legal right and estate to and in the premises, and a legal right to the possession.

The legislature, in framing the statute in question, intended to require the party to disclose the nature of his right to the possession, how, and from whom it was acquired, so that it would appear that his right was a legal and valid one.   The statement in the complaint is not in compliance with the statute; it is a mere allegation that the right exists, without stating the right.   It is

alleged, however, that the relator and his grantor has been in possession for more than five years, and the right to the possession still continues. Possession is *prima facie* evidence of ownership in fee.

It was held in *The People* v. *Leonard*, (11 *John.* 504,) that proof of peaceable possession, in proceedings for forcible entry and detainer, is *prima facie* evidence of estate to support the allegation in the indictment, under the act then in force, that the complainant was seised.

But if the allegation was not sufficiently full and specific, the defendant should have raised the question before the judge, to have entitled himself to the benefit of the objection. He might have moved at the special term to dismiss the proceedings for the defect. (*Carter* v. *Newbold*, 7 *How. Pr.* 166. *People* v. *Reed*, 11 *Wend.* 157. *Same* v. *Same*, 13 *How.* 446.)

The complaint is not so defective as to deprive the officer of jurisdiction.

The important questions in this case requiring consideration, are:

1st. Was the complainant, in the actual possession of the premises, forcibly entered or forcibly detained?

2d. Was there a forcible entry or detainer proved?

I. Was the complainant in the actual possession of the premises? Section 11 of the Revised Statutes, relating to forcible entry and detainer, (3 *R. S.* 5*th ed.* 831,) provides that the complainant shall only be required to show on the trial of a traverse by the defendant, in addition to the forcible entry, or detainer, that he was peaceably in the actual possession of the premises at the time of the entry, or was in the constructive possession at the time of the forcible holding out. From this and other provisions of the act, it is obvious that the legislature intended to prevent all persons, however good their title or right to the possession of premises, from forcibly acquiring possession of them; and having peaceably

acquired possession, from holding out another, who at the time of such entry or holding out, was peaceably in possession thereof. In such case the party entitled must resort to *ejectment* or *other legal measure*, to acquire possesion.

If such is the object of the statute, it matters not how invalid the occupant's right to possession may be; if he is in the peaceable and quiet occupancy of premises, that occupancy cannot be *forcibly invaded.*

It is said in *The People* v. *Reed*, that a mere intruder or trespasser cannot institute proceedings under the statute and be restored to the possession he unlawfully held. If by this is meant that a person who intrudes, or trespasses on my land, and is by me forcibly removed, or held out, cannot in proceedings against me be restored to the possession from which I forcibly removed him, I most cordially assent to the proposition. But if the learned judge intended to hold that a person who, without right, enters on my land and who is therefore as to me a trespasser, cannot in proceedings under the statute be restored to possession as against a *third person* having no interest in or right to the possession, I cannot conceive why such an intruder may not institute preceedings against the owner, as well as against a person without interest in the premises, by reason of the alleged force; but the restoration to possession cannot be had by an intruder as against the lawful owner. It is settled that the owner of land may forcibly remove from them any one who is in possession of them without right, and an action of trespass will not lie against him. (*Wilde* v. *Cantillon,* 1 *John. Cas.* 123. *Hyatt* v. *Wood,* 4 *John.* 150. *Ives* v. *Ives,* 13 *id.* 235. *Jackson* v. *Morse,* 16 *id.* 197. *Estes* v. *Kelsey,* 8 *Wend.* 555.) But the person so entering, whether owner or not, may be indicted and punished for unlawful force. (*Hyatt* v. *Wood,* 4 *John.* 150. *Ives* v. *Ives.* 13 *id.* 235. *Jackson* v. *Morse,* 16 *id.* 197.)

This question of possession is a mixed one of law and fact. The facts relating to it are that one Fish, in 1857,

owned the building which then stood on the west side of Main street in the village of Oneida and which he occupied as a harness shop. In 1857, as I understand it, Fish moved the shop on the place where it stood at the time of the alleged forcible entry. In July, 1862, Fish sold the shop to the complainant Cooper, but remained in it as tenant of Cooper until April, 1863, when he left, surrendering the key to Cooper. There were a pair of hay scales on one side of the building, coal and lumber were piled on another. The building was erected by one Higinbotham. The land on which it stood belonged to the state, but at what time the state acquired the same, or what connection Higinbotham had with the premises, does not appear. Higinbotham gave Fish permission to occupy it until he should want the land. Cooper testifies that he was in the shop at the time Fish surrendered possession and gave up the key, and he then locked it up. On the 8th of June, 1863, the day before the unlawful entry by the defendant, he again went into the building, so that he was only twice in the building between April, 10, and June 9, 1863. The building, as between Higinbotham and Cooper was personal property. So, doubtless, it was between the state and Cooper, but as it stood on the land, the person in possession of the house was in possession of the land. It was impossible for one person to be in possession of the house, and another to be at the same time in possession of the land on which it stood. For all purposes of the statute regulating proceedings in forcible entry and detainer, the person in possession of the house must be deemed to be in possession of the land. I think Cooper was in the actual possession of the house; he did not occupy it, or use it, but he had been in the receipt of the rents and profits, and was about to put in order to rent it; he went into it whenever he had occasion to do so, and no person had either the possession, or the right to the possession. If he did not have

possession or ownership, or any other interest beyond a mere right of possession, which is essential to such possession; if his possession was neither *actual* nor constructive; then the premises were beyond the pale of the law, and his property might be destroyed with impunity.

The building was on the land of the state, without objection from any person. Cooper had the right to keep it there until the state, or its grantee or lessee, should require its removal. If, under these circumstances, Cooper is not to be deemed in the actual possession of the premises, then it must follow that no man is in the actual possesion of a house which he usually rents but is for the time being vacant.

The mechanic who owns a shop which he does not work in, but it stands on another's land by such other's permission, is not in the actual possession. A great variety of cases might be suggested in which there would be no actual occupation, if Cooper was not in the actual possession of the premises in question.

It is said in *Comyn's Digest* under the head of "Forcible entry and detainer," that an entry is forcible, if the person entering break the door and enter, though nobody be within.

In 2 *Burns' Justice*, 176, it is said, that it seems to be agreed, that an entry may be forcible, not only in respect to the violence actually done to the person of a man, as by beating him, if he refuses to relinquish his possession, but also in respect to any other kind of violence, in the manner of the entry, as by breaking open the door of a house, whether any person be in it or not, especially if it be a dwelling house; and also by any other act of outrage after the entry, *as by carrying away the party's goods.*

This proposition, that actual occupancy at the time of the entry is not necessary in order to entitle the person injured to proceed under the statute, has been recognized in all the authorities, and it is too late to disturb it now, whatever our opinion might be as to its correctness.

The entry, to be forcible, ought to be accompanied with some circumstances of actual violence or terror. (2 *Burn's Justice*, 176.) Of what importance can violence or terror, dangerous weapons, or a multitude of people be where there is no one in possession to be terrified? Yet within the principle stated by *Burn and Comyn*, these circumstances will constitute an entry forcible, though no person be on the premises at the time the entry is made. There can neither be a breach of peace, nor danger of a breach of it, where any entry, however violent, is made upon unoccupied premises. The object of the act being to prevent acts of violence upon persons being in the quiet and peaceable occupancy of land, I do not perceive how the statute is violated when there is no person upon whom the injury can be inflicted. I can understand, however, there can be in such case a forcible detainer, but not how the entry can with any propriety be called forcible; all the objects secured could have been attained by holding that a forcible entry could only be made upon a person actually in the peaceable possession of the premises at the time the entry was made. If no one was in the actual possession, and an unlawful entry was made, and the person entitled to the actual possession was forcibly kept out, forcible *detainer* was established; the person kept out would be entitled to be reinstated. While I think this should be the law, I do not think we are at liberty so to declare it, in view of the decisions of the courts in this country, as well as in England. (1 *Hawkins' Pl.* 264, §§ 26, 27.) It is said that if a man finds another out of his house, and therefore enters and prevents the other from returning, it is a forcible entry. It is clearly a forcible *detainer;* no satisfactory reason is assigned why it should be called a forcible entry.

In *People* v. *Runkle*, (8 *John.* 466, *and* 9 *id.* 147,) it was held that the defendants were liable for forcibly entering a church of which the complainants were the trustees,

The People *v.* Field.

although the entry was made when neither trustees nor any other person were in the church. If the possession of trustees of a church is an actual possession, so as to entitle them to the benefit of the statute in relation to forcible entry and detainer, it would seem to follow that the complainant was also in the actual possession of the shop.

While I am decidedly of the opinion that it would have more effectually carried out the intention of the legislature, that no one not actually upon the premises at the time of a forcible entry could institute proceedings under the statute, no matter how forcible such entry might be, yet the rule seems to be settled the other way, and I am not prepared to overrule it.

II. Was the entry forcible? In *Burn's Justice,* (*vol.* 2 *p.* 176,) it is said, if the entry be peaceable, and there shall be force or violence, and the person entering cut or take away any corn, grass or wood, or shall forcibly or wrongfully carry away any other goods then there being, this seemeth to be a forcibly entry, punishable by the statute, that is to say, the statute against forcible entry and detainer. Again, on the same page, it is said, that perhaps an entry may also be rendered forcible by any act of outrage after the entry, as by carrying away the party's goods, &c.

The force forbidden by the stature is of two kinds: 1st. Against the *person* in possession. 2d. Force or violence forbidden by law is that which is directed against *person* or *property.* If one person goes to the house of another and drives him out, or, being armed, or having with him a multitude of people, frighten the occupant so that he leaves, the entry in all such cases is forcible. This is the first kind of force. The second kind is used where the entry is made upon premises of which no one is at the moment in occupancy, with such a number of persons so conducting themselves, as to constitute a riot, or other breach of the peace. (*Willard* v. *Warren,* 17 *Wend.* 257.) The

facts proved did not establish the first kind of force; there was no one in the possession, and hence there was no person towards whom violence could be used; neither do I think that there is evidence to authorize a jury to find that the entry was made riotously or maliciously, or that any breach of the peace was committed.

If the law is as stated by Burn, that the acts of the party after entry, towards the property, and not towards the person of the occupant, might be held to characterize the entry, making it forcible, while, in fact, it was peaceably, enough was done to constitute a forcible entry in this case. The defendant carried off the building and placed it on other premises.

But I do not think that a peaceable entry can be converted into a forcible one, merely by violence alone to the property on which the entry is made.

I am of the opinion, however, that enough was proved to require the court to submit it to the jury, whether there was not a forcible detainer. Not only did the party enter, but he removed the building, having with him such a number of persons as would render it unsafe for the complainant to attempt to go again on the land, and he was told that the defendant had now got possession of the land, and meant to hold it.

It was for the jury to say what was the meaning of this language, in view of the conduct of the defendant in removing the building and entering and occupying the premises. If he meant to say to the complainant, you must not attempt to come on this land; I will hold it at all hazards, by the use of whatever force and violence may be necessary—and it is for the jury to say whether this was not the fair import of the defendants' language—a forcible holding out was proved.

One ground for the motion for a nonsuit was that the case as proved did not fall within the definition of forcible entry and detainer. Although the motion was not granted,

but a verdict ordered, it was obviously on the ground that neither a forcible entry or detainer was proved. Two of my brethren are of opinion that *both a forcible entry and detainer* was proved.

I am quite clear that enough was proved to require the case to be submitted to the jury. I am, therefore, of opinion that the judgment be reversed, and a new trial ordered, costs to abide the event.

[ONONDAGA GENERAL TERM, June 27, 1865. *Mullin, Foster, Morgan* and *Bacon*, Justices.]